IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DONOVAN KENT, | § | |
| | § | No. 341, 2024 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1801002038 |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: February 19, 2025
Decided: March 31, 2025

Before **VALIHURA**, **LEGROW**, and **GRIFFITHS** Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Patrick J. Collins, Esquire, Collins Price & Warner, Wilmington, Delaware for Appellant.

Julie M. Donoghue, Esquire, Delaware Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

Donovan Kent ("Kent") appeals the Superior Court's denial of his motion for postconviction relief.[1] On March 12, 2018, a grand jury indicted Kent on the following six counts: Rape Second Degree (Count I), Unlawful Sexual Contact First Degree (Count II), Unlawful Sexual Contact First Degree (Count III), Rape Second Degree (Count IV), Unlawful Sexual Contact First Degree (Count V), and Continuous Sexual Abuse of a Child (Count VI).[2] All charges involved a minor, S.A., a female child who was six at the time of the alleged incidents. The time frame for each of the six counts was alleged as being "on or between the 1st day of July, 2017 and the 11th day of October, 2017."[3] Both Rape counts and two Unlawful Sexual Contact counts were alleged in the indictment to have occurred at "S.A.'s Aunt's residence." The Continuous Sexual Abuse of a Child count did not include a specific location. The other Unlawful Sexual Contact count (Count V) was alleged to have occurred at S.A.'s residence.

During a four-day trial in the Superior Court from December 4 to December 7, 2018, the State sought to amend Count IV, to change the location of the incident to S.A.'s residence. The State further sought to amend Counts I– IV to change the date range to encompass a longer period of time by adding the months of May and June.[4] The Court granted the amendment to change the location referenced in Count IV, but denied the motion to amend the indicted date ranges. At the close of the evidence, Kent moved to

---

[1] The motion for postconviction relief was filed below pursuant to Superior Court Criminal Rule 61.

[2] *See* A12–14 (Indictment).

[3] *Id*.

[4] A558, A564.

2

dismiss one count of Rape Second Degree and, alternatively, moved for judgment of acquittal on both counts of Rape Second Degree. The trial court denied the motion.[5] That same day, the jury found Kent guilty of Counts II, III, V, and VI (all counts of Unlawful Sexual Contact and Continuous Sexual Abuse of a Child), as well as the lesser-included offenses of Attempted Rape Second Degree on Counts I and IV.

Following the verdict, trial counsel filed a Motion for Judgment of Acquittal and a Motion for New Trial. In his Motion for Judgment of Acquittal, Kent challenged the sufficiency of the evidence as to the guilty verdict of Attempted Rape Second Degree. In his Motion for a New Trial, Kent argued that the State improperly vouched for one of its witnesses, improperly vouched for its case, and misstated the evidence in closing arguments. The trial court denied both motions on September 25, 2019, in a written opinion.[6] Kent was sentenced to a total of 29 years of unsuspended Level V incarceration followed by probation.

In his direct appeal to this Court, Kent argued that five of the six convictions should be vacated.[7] He raised four claims of error. First, he argued that the Superior Court erred in not *sua sponte* issuing a judgment of acquittal on Count VI, Continuous Sexual Abuse of a Child, because the evidence failed to establish that the alleged acts of sexual misconduct occurred over a period of not less than three months.[8] Second, he argued that

---

[5] A561.

[6] *State v. Kent,* 2019 WL 4723823 (Del. Super. Sept. 25, 2019).

[7] Kent did not challenge one of his convictions for Unlawful Sexual Contact in the First Degree.

[8] That offense requires that the defendant have committed three or more acts of sexual misconduct during a period of not less than three months.

the jury instructions regarding that charge confused the jury. Third, he contended that the Superior Court erred in allowing the State to amend one of the Rape counts in the indictment (Count IV) after the close of the evidence. Fourth, he argued that the Superior Court erred in not *sua sponte* issuing a judgment of acquittal on the other Rape count (Count I), and two of the Unlawful Sexual Contact counts (Counts II and III). He alleged that there was no evidence from which a jury could infer that the alleged conduct supporting those counts occurred within the time frame stated in the indictment. We rejected all four claims of error and affirmed the rulings of the Superior Court on direct appeal. [9]

Kent filed a *pro se* motion for appointment of counsel and a *pro se* motion for postconviction relief. Kent's appointed counsel filed an amended motion for postconviction relief, and trial counsel filed an accompanying affidavit. On October 5, 2023, the Superior Court held an oral argument on Kent's motion for postconviction relief.[10] Kent argued that his trial counsel had provided ineffective assistance of counsel by unreasonably introducing evidence of a second child potentially molested by him, and that the introduction of this evidence caused him prejudice. More specifically, he argued that his trial counsel's cross-examination of the victim's mother, in an attempt to impeach her, improperly injected a possible second victim which resulted in a "mini-trial" occurring. He also argued that his trial counsel was ineffective by failing to move for judgment of

---

[9] *Kent v. State*, 262 A.3d 1065, 2021 WL 4393804 (Del. Sept. 24, 2021).

[10] *See* A1119–1155 (Oral Argument on the motion for postconviction relief in the Superior Court held on October 5, 2023) [hereinafter "Argument Tr. at _."].

4

acquittal on Count VI (Continuous Sexual Abuse of a Child) because in Kent's view, there was no evidence presented that showed that he had recurring access to the victim during the required time frame.

Following oral argument, the Superior Court scheduled an evidentiary hearing. Kent's counsel had not requested one initially because Trial Counsel had admitted in his affidavit to providing ineffective assistance to Kent. But the Superior Court was unable to make a finding as to the adequacy of Trial Counsel's investigation because no information had been presented to the court as to what investigation had occurred.[11]

Accordingly, the Superior Court conducted an evidentiary hearing on February 15, 2024.[12] During the hearing, Kent's Trial Counsel testified regarding his investigation and decision to call Hudgins as a witness. Following the hearing, the Superior Court denied his motion for postconviction relief.[13]

In this appeal, Kent argues that the Superior Court erred by denying his motion for postconviction relief. We AFFIRM the Superior Court's judgment. First, we agree with the Superior Court's determination that Kent's Trial Counsel was not ineffective. Kent's Trial Counsel pursued a legitimate trial strategy that only fell apart once the witness used to impeach the victim's mother perjured herself during cross-examination. Second, we

---

[11] A1153–54 (Argument Tr. at 36:1–16).

[12] A1156 (Hearing Transcript of the Feb. 15, 2024 Evidentiary Hearing [hereinafter "Feb. 15, 2024 Hearing Tr."]).

[13] *State v. Kent,* 2024 WL 3595633 (Del. Super. July 31, 2024).

5

agree with the Superior Court that there is no basis to find that Kent's Trial Counsel should have moved for judgment of acquittal because it would have been unlikely to succeed.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[14]

### A. The Underlying Incidents

From January 2017 to April 2017, Donovan Kent ("Kent") was living in Brookside with Jessica Hepner ("Hepner"), Christopher Adams ("Adams"), their daughter S.A., and S.A.'s two younger brothers.[15] During that time, they all slept in one room of a house owned by Hepner's mother. From May 2017 to July 2017, Kent lived with Hepner's brother Brandon and his girlfriend, Carolyn Irving ("Aunt Carolyn"). Hepner testified that S.A. slept over there when Kent was living there.[16] Around the end of July or the beginning of August 2017, Hepner and her family moved to a house in Sparrow Run in Newark, Delaware, and Kent moved in with them at Hepner's invitation not long after.[17] The home was being renovated. As a result, Kent, S.A., and her brother slept on mattresses on the floor of the living room.[18]

On October 10, 2017, then six-year-old S.A. told Hepner that "something happened with [Kent]."[19] After S.A. explained what happened, Hepner confronted Kent and

---

[14] The facts, except as otherwise noted, are derived from the trial transcript below. App. to Opening Br. at A42–639 (Trial Tr.).

[15] *Id.* at A172, 177 (Jessica Hepner Trial testimony [hereinafter "Hepner Trial Test. at _"]) (Initials of the minor will be used in place of her name).

[16] *Id.* at A176–78 (Hepner Trial Test.); A246 (Hepner Trial Test. at 7:14–15).

[17] *Id.* at A175–76 (Hepner Trial Test. at 20:7–13); A194; A449 (Adams Trial Test at 7–8).

[18] *Id.* at A178–79.

[19] App. to Opening Br. at A181 (Hepner Trial Test. at 25:20–22).

ultimately began to choke him until he fled the house. Hepner took S.A. to Christiana Hospital where S.A. was interviewed and examined by a forensic nurse examiner. S.A. was later taken to the Children's Advocacy Center ["CAC"] where she was interviewed again.

### B. The Proceedings Below and Trial

On March 12, 2018, a grand jury indicted Kent on the six felony counts described above, namely, two counts of Rape Second Degree, three counts of Unlawful Sexual Contact First Degree, and one count of Continuous Sexual Abuse of a Child.

Trial commenced on December 4, 2018 and concluded on December 7, 2018. Before trial began, Kent twice rejected plea offers from the State. On December 7, 2018, the State sought to amend Count IV, the second Rape count, to change the location of the incident from S.A.'s aunt's house to S.A.'s house. Additionally, the State moved to amend four counts (Counts I – IV) to expand the date range from July 1, 2017 – October 11, 2017 to include May and June of 2017.[20] The Superior Court granted the amendment to change the location of Count IV, finding that it was not a substantive change because Kent had been on notice that the conduct happened in both locations. However, the Superior Court denied the motion to expand the date range, finding that it would constitute a substantive change to the charges.[21]

---

[20] *Id*. at A558–64.

[21] *Id.* at A567–68.

According to the Public Defender's Log, just before the commencement of trial, the State made Trial Counsel aware that S.A.'s mother, Jessica Hepner, had made a report to police about a possible second child victim.[22] The State advised Trial Counsel that Hepner told Detective Knorr that Cathy Hudgins told Hepner that Kent may have molested Hudgins' daughter years ago. The State further advised that Detective Knorr spoke with Hudgins and that Hudgins denied ever telling Hepner that Kent had inappropriately touched M. The State also advised Trial Counsel that it would not elicit any testimony about a possible second victim unless the defense opened the door to such testimony.

At trial, the State called several witnesses including S.A. and her mother, Jessica Hepner. Hepner testified generally as to the events surrounding the charges. On cross-examination, Kent's trial counsel ("Trial Counsel") opened that door by asking if Hepner knew a friend of Kent's mother named Cathy, and if so, whether Cathy had daughters named M and C.[23] Hepner testified that she did know Cathy and her one daughter, M. Hepner stated that on one occasion, M was dropped off at her house and immediately secluded herself in a corner and would not look at Kent.[24] Trial Counsel then asked Hepner if she had made a statement to a Detective about Cathy, and the State immediately asked for a sidebar. There, the State explained:

> "I want to make a record. If [Trial Counsel] chooses to do this, I don't necessarily have an objection, but I want to make a record that I believe the line of questioning he's about to ask is about when—some background—at

---

[22] *Id*. at A993–94.

[23] *Id.* at A199 (Hepner Trial Test. at 43:7–21) (Initials are used due to the ages of the children at the time of the allegations).

[24] *Id.*

8

one point after [Kent] was arrested, the witness on the stand; [S.A.'s] mother, said that she had this woman Cathy . . . stop by her house at one point and ran into her and that Cathy said how's [Kent], and she said in response, don't even bring up his name, he touched my daughter. And in response to that, Cathy said [Kent] touched my daughter, too, once in a motel room or something along those lines. Then at that point [Hepner] reported that to Detective Knorr and Detective Knorr did a follow-up investigation, spoke with Cathy, and Cathy denied ever saying that to [Hepner]."[25]

….

"If [Trial Counsel] brings this in, it brings in an allegation, potentially, of sexual abuse against [Kent] with another child, and I believe if he tries to bring this in to impeach this witness, it will open up the door to me bringing in other allegations of sexual abuse and the other daughter, [C], who was interviewed and talked about that incident, as well as her own experiences with [Kent] touching her when she was a child in that same house. And I believe that if he's going to impeach this witness' credibility, it's going to open up the door."[26]

The State continued to explain that Cathy's daughter, M, denied that Kent had ever touched her. But Cathy's other daughter, C, had told police that something happened between the two of them when they were children.[27] Kent's Trial Counsel explained that he wanted to pursue this line of questioning because M had denied the allegation, and he could, therefore, establish that Hepner was not being truthful about what Cathy said.[28] The State argued that by opening this door, it would be permissible to bring in evidence of Kent's alleged assault of both daughters. Trial Counsel argued that one of the daughters,

---

[25] *Id.* at A200–01 (Hepner Trial Test. at 44:10–23).

[26] *Id.* at A201 (Hepner Trial Test. at 45:5–21).

[27] *Id.* at A202 (Hepner Trial Test. at 46:3–12).

[28] *Id.* at A203, A226. (Trial Counsel stated that, "[t]he purpose of me asking questions of Miss Hepner is regarding an inconsistent statement which she made which is that she told Detective Knorr that she was informed by Cathy Hudgins that [Kent] had touched her daughter, [M].").

9

C, was older than Kent and, therefore, any such incident would not be relevant.[29]  Trial Counsel ended his cross-examination and the jury was dismissed for the day pending *voir dire* questioning of Hepner.

During *voir dire*, Hepner testified that Cathy Hudgins told her that there was an incident between Kent and her daughter when Hudgins' family was staying at a motel.[30]  The next day before trial, the State advised the Superior Court that the incident between Hudgins' older daughter C and Kent happened over ten years ago when the two were 11 and 10 years old, respectively.  The alleged incident with M at the motel happened around the same time.[31]  The Superior Court ruled that any details of the incidents with C and M were inadmissible.[32]

The cross-examination of Hepner then resumed, and Trial Counsel asked her if she had told Detective Knorr that Cathy had told her that Kent touched M.[33]  Hepner stated that she had, and she reported the conversation to Detective Knorr.

The next day, on December 6, 2018, Trial Counsel called Cathy Hudgins to testify.  Consistent with his "standard operating procedures," Trial Counsel spoke with Hudgins in the courtroom before her testimony.[34]  As Trial Counsel expected, Hudgins testified that

---

[29] *Id.* at A204 (Hepner Trial Test. at 48:8–23).

[30] *Id*. at A213 (Hepner Trial Test. at 57:15–23);  A243 (Hepner Trial Test. At 4:5–8);  A244 (Hepner Trial Test at 5:1–13).

[31] *Id*. at A226-27.

[32] *Id.* at A231.

[33] *Id.* at A243–44 (Hepner Trial Test.).

[34] *Id.* at A1172, 1197 (Feb. 15, 2024 Hearing Tr. at 42).

she never told Hepner that Kent had touched her daughter.[35] This testimony aligned with what Hudgins had told the defense investigator before trial began.

On cross-examination, however, Hudgins' testimony began to unravel. First, Hudgins clarified that Hepner began to cuss at her when speaking about Kent, so Hudgins walked away from the conversation. Then, the State asked if Hudgins was in the neighborhood to buy drugs. Hudgins denied this and denied ever having a drug problem.[36] She admitted to having two shoplifting convictions in recent years. Hudgins continued to testify that she had often stayed at motels throughout her life, but she denied that Kent was around during those periods.[37] The State confronted Hudgins with Detective's Knorr's police report which stated that Hudgins had stated that Kent had been around when she and her children lived in a motel. In response, Hudgins testified that she never made that statement, and that Detective Knorr was lying in her report.[38] Hudgins was then confronted with her drug convictions. Contradicting her earlier testimony, Hudgins admitted that she had been convicted of misdemeanor drug offenses in 2015. Finally, Hudgins admitted that Kent had previously been alone with both of her children, once again contradicting her prior testimony.

On the last day of trial, Kent's Trial Counsel made an oral motion for Judgment of Acquittal on the two Rape Second Degree charges. The Superior Court denied the

---

[35] *Id.* at A508 (Hudgins Trial Test. at 28:6–10).

[36] *Id.* at A509 (Hudgins Trial Test. at 29:7–15).

[37] *Id.* at A511 (Hudgins Trial Test. at 31:11–20).

[38] *Id.* at A512 (Hudgins Trial Test. at 32:5–17).

11

motion.[39] That same day, the jury returned its verdict. The jury found Kent guilty of three counts of Unlawful Sexual Contact, two counts of the lesser-included offense of Attempted Rape Second Degree, and one count of Continuous Sexual Abuse of a Child.

Following the trial, Kent filed a renewed Motion for Judgment of Acquittal and a Motion for New Trial.[40] Kent argued that there was insufficient evidence to support his convictions for Attempted Rape Second Degree, that the State had improperly vouched for witnesses, and that the State had misstated the evidence. The Superior Court denied both motions on September 26, 2019.[41] On August 14, 2020, the Superior Court sentenced Kent to a total of 29 years of unsuspended Level V incarceration followed by probation.

## C. Direct Appeal

Represented by different counsel, Kent filed a timely notice of direct appeal. Two of Kent's four claims of error on direct appeal (described above) are relevant to this present appeal from the denial of his Rule 61 motion for postconviction relief. First, Kent argued that the Superior Court erred in not *sua sponte* issuing a judgment of acquittal on Count IV, Continuous Sexual Abuse of a Child, because the evidence failed to establish that the qualifying acts of sexual misconduct occurred over a period of not less than three months.

We affirmed the Superior Court's ruling as to this issue. We held that the evidence established that sexual abuse comprised of multiple acts occurred once at the aunt's house and "a lot" at S.A.'s residence. We stated that "[a]lthough the exact date of the abuse at

---

[39] *Id.* at A559–61.

[40] *Id.* at A732–44, A745–54.

[41] *State v. Kent,* 2019 WL 4723823 (Del. Super. Sept. 25, 2019).

the Aunt's residence was not specified by direct evidence, whether the evidence circumstantially established that the abuse occurred over a period of not less than three months could have been viewed by the trial judge as presenting a question of fact for the jury."[42]

Second, Kent argued that the Superior Court erred in not *sua sponte* issuing a judgment of acquittal on Counts I, II, and III, all of which alleged offenses occurring at the aunt's residence, because there was no evidence from which a jury could infer that the alleged conduct occurred within the time frame stated in the indictment. Specifically, he contended that the evidence could only establish that the incidents occurred at some point between May and the end of July 2017. He argued that because he lived at S.A.'s aunt's house from May to the end of July, it was more likely that the conduct at S.A.'s aunt's house occurred sometime in May or June rather than in the time frame alleged in the indictment, namely, July 1, 2017 to October 11, 2017.

This Court rejected Kent's claim as purely "speculative."[43] We stated that "[a]lthough it is possible that incidents alleged in Counts I, II or III may have occurred in May or June rather than July, a jury rationally could have inferred that the improper sexual conduct occurred at S.A.'s aunt's house in the timeframe stated in the indictment."[44] We

---

[42] *Kent v. State*, 2021 WL 4393804, at *4 (Del. Sept. 24, 2021). We stated further that, "[w]e are not persuaded that the trial judge should have intervened *sua sponte* and granted a judgment of acquittal in the absence of a defense motion. Plain error is a demanding standard, and there is no plain error here." *Id*.

[43] *Id*. at *6.

[44] *.Id.*

13

further observed that "the date and time of each act of sexual abuse against a child victim does not need to be stated with exact specificity."[45] Accordingly, as to Kent's direct appeal, we found no plain error and affirmed the judgment of the Superior Court on September 24, 2021.

### D. Kent's Motion for Postconviction Relief

On March 23, 2022, Kent filed a *pro se* motion for postconviction relief and a *pro se* motion for appointment of counsel. Kent's appointed counsel filed an amended motion for postconviction relief on January 6, 2023. Kent's appointed counsel alleged that Kent's Trial Counsel had provided ineffective assistance by unreasonably introducing evidence of a second child potentially molested by him.[46] Kent argued that Trial Counsel's cross-examination of Hepner, in an attempt to impeach her, improperly injected the possible second victim which caused a "mini-trial" to occur causing him prejudice. Additionally, Kent argued that he was prejudiced by Trial Counsel's failure to move for judgment of acquittal on Count VI (Continuous Sexual Abuse). He argued that there was no evidence presented that showed he had recurring access to the victim during the required time frame.

On March 1, 2023, Kent's Trial Counsel submitted an affidavit in response to Kent's motion for postconviction relief.[47] As the State put it, Trial Counsel "fell on his sword" in stating in his affidavit that his assistance to Kent had been ineffective.[48] Trial Counsel

---

[45] *Id*.

[46] App. to Opening Br. at A1078.

[47] *Id.* at A1089.

[48] *Id*. at A1098 (State's Response to Defendant's Amended Motion for Postconviction Relief dated May 1, 2023).

explained that although the purpose of the cross-examination was to establish that Hepner was being untruthful, he "did not adequately investigate the flaws of Cathy Hudgins as a witness prior to putting her on the stand."[49]  Trial Counsel noted that "in hindsight, the strategy of putting her on the stand was unreasonable."[50]  He also averred that after reviewing Kent's motion for postconviction relief, "it is clear that Counsel should have made an oral motion for judgment of acquittal as to the charge of Continuous Sexual Abuse of a Child."[51]

The State disagreed that Kent had been prejudiced by his Trial Counsel's decision to cross-examine Hepner and by calling Hudgins as a witness, arguing that these decisions were strategic choices that were reasonable under the circumstances.  The State argued further that there was sufficient evidence to support the conviction for Continuous Sexual Abuse, and that Trial Counsel's performance at trial did not reach the high threshold needed to establish ineffective assistance of counsel.  Even if Trial Counsel had acted unreasonably, the State maintained that no prejudice had resulted.

Following oral argument and an evidentiary hearing, the Superior Court denied the amended motion for postconviction relief on July 31, 2024.[52]  The Superior Court first determined that Kent's Rule 61 motion was not procedurally barred.  Then, in addressing the merits of Kent's claim regarding the cross-examination of Hepner, the Superior Court

---

[49] *Id.* at A1089.

[50] *Id.*

[51] *Id*. at A1089–90.

[52] *State v. Kent*, 2024 WL 3595633 (Del. Super. July 31, 2024).

15

held that "Kent has failed to overcome the strong presumption that Trial Counsel acted reasonably, and therefore, Kent's ineffective assistance claim related to Hudgins's impeachment must fail."[53]  The Superior Court noted that "Kent admits that impeaching the credibility of Hepner was a legitimate purpose[.]"[54]

Regarding Trial Counsel's decision to call Cathy Hudgins as a witness, the Superior Court found that:

> Despite the "flaws" that arose from Trial Counsel's strategy, there was evidence of a reasonable strategy.  Also, one of the "flaws" was the result of Hudgins perjuring herself on cross-examination.  Accordingly, Trial Counsel then abandoned his trial strategy.  Although Trial Counsel admitted in hindsight, that he should have conducted a more thorough investigation of Hudgins and her testimony, as noted above, hindsight is not the standard to determine whether an attorney's representation fell below the objective standard.  Moreover, Trial Counsel testified that he followed his usual investigation protocol.[55]

Finding that Trial Counsel had acted reasonably, the Superior Court declined to address Kent's claim that the alleged deficiencies caused him prejudice.

Turning to Kent's second claim, namely, that Trial Counsel was ineffective by failing to move for judgment of acquittal on the Continuous Sexual Abuse charge, the Superior Court held that "Kent's argument on this claim fails to meet the second prong of *Strickland* because he has not demonstrated that, had Trial Counsel moved, it is reasonably probable the trial judge would have granted such a motion."[56]  The Superior Court looked

---

[53] *Id.* at *3.

[54] *Id.* at *2.

[55] *Id.* at *3 (internal citations omitted).

[56] *Id.* at *4.

to the sufficiency of the evidence presented at trial regarding recurring access and this Court's review of the evidence under a plain error standard on direct appeal. The Superior Court determined that:

> Even under a less deferential standard of review, the State offered testimony that: Kent sexually abused the victim "more than three times" at multiple different locations, including her aunt's house and her own residence; Hepner testified that Kent lived with the victim's aunt, prior to him moving in with Hepner and her family; the victim slept at the aunt's house while Kent was living with the aunt; and Hepner and Kent have remained close friends since childhood.[57]

Because there was evidence to support Kent's recurring access to the victim, the Superior Court reasoned that it was for the jury to weigh the evidence and credibility of the witnesses. Ultimately, the Superior Court determined that Kent's claim of prejudice was without merit.

### E. Kent's Contentions on Appeal from the Denial of Postconviction Relief

Kent raises two issues in this second appeal to our Court. First, he asserts that the Superior Court erred in denying his amended motion for postconviction relief because his Trial Counsel introduced evidence of a second child victim without adequate investigation.[58] Second, he contends that the Superior Court erred in denying his amended motion for postconviction relief because his Trial Counsel failed to move for judgment of acquittal on the Continuous Sexual Abuse of Child charge despite the insufficiency of the

---

[57] *Id.*

[58] Kent's argument before the Superior Court and now, before this Court, are essentially the same, with the exception that he now includes an argument that Trial Counsel failed to adequately investigate the "flaws" in the witness used to impeach the victim's mother.

17

evidence regarding his recurring access to the victim. Kent asserts that both actions by his Trial Counsel prejudiced the result of his trial.

## II. STANDARD OF REVIEW

This Court reviews the Superior Court's denial of a motion for postconviction relief for abuse of discretion.[59] We apply a *de novo* standard of review for legal and constitutional questions, including ineffective assistance of counsel claims.[60]

## III. ANALYSIS

### A. The Superior Court Did Not Err in Denying Relief Because Kent's Counsel Was Not Ineffective for Introducing Evidence of a Second Victim

In *Cooke v. State*,[61] we recently summarized the requirements for satisfying the standard for succeeding on an ineffective assistance of counsel claim. According to that standard, set forth in *Strickland v. Washington*,[62] Kent must show that his "counsel's representation fell below an objective standard of reasonableness."[63] If he is successful there, Kent must then demonstrate sufficient prejudice to his defense.[64]

To prevail on the first part of the *Strickland* test – the performance prong – Kent bears a heavy burden.[65] "Judicial scrutiny of counsel's performance [is] highly

---

[59] *Green v. State,* 238 A.3d 160, 173 (Del. 2020) (citing *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013)).

[60] *Id.*

[61] 2025 WL 16395 (Del. Jan. 2, 2025).

[62] 466 U.S. 668 (1984).

[63] *Cooke*, 2025 WL 16395, at *24 (quoting *Strickland*, 466 U.S. at 688).

[64] *Id.*

[65] *Id.* (citing *Hoskins v. State*, 102 A.3d 724, 730 (Del. 2014)).

18

deferential."[66]  "Courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"[67]  In his effort to rebut this strong presumption, Kent bears the burden of persuasion.[68]

Even if Kent is successful in showing that his counsel's actions were objectively unreasonable, "*Strickland*'s second part – the prejudice prong – presents another arduous standard."[69]  "To demonstrate prejudice caused by counsel's ineffectiveness, a defendant 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[70]  Although the reasonable probability standard requires less than a preponderance of the evidence, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome," which "requires a 'substantial,' not just 'conceivable,' likelihood of a different result.'"[71]  "We may dispose of an ineffective-assistance-of-counsel claim based on the absence of sufficient prejudice without addressing the performance prong if, in fact, prejudice is lacking."[72]

Kent's first claim on appeal fails the *Strickland* test because Trial Counsel did not perform deficiently within the meaning of *Strickland's* prong one.  Kent asserts that the

---

[66] *Strickland*, 466 U.S. at 689.

[67] *Cooke*, 2025 WL 16395, at *24 (citing *Green,* 238 A.3d at 174).

[68] *Id.*

[69] *Id.* at *25.

[70] *Starling v. State*, 130 A.3d 316, 325 (Del. 2015) (quoting *Strickland*, 466 U.S. at 694).

[71] *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *see also Starling*, 130 A.3d at 325.

[72] *Cooke*, 2025 WL 16395, at *25 (quoting *Green*, 238 A.3d at 174–75).

decision to impeach Hepner was objectively unreasonable because even if the testimony went according to plan, it is unclear how impeaching Hepner would have been helpful. He further argues that the strategic "flaws" in Trial Counsel's strategy arose as soon as he cross-examined Hepner about Hudgins, not when Hudgins perjured herself. Kent believes a lack of investigation contributed to these flaws.

These claims are unavailing for Kent because Trial Counsel's decision to impeach Hepner was a reasonable strategic choice in the face of overwhelming evidence against his client.[73] Kent argues that introducing the possibility of a second victim was unhelpful because S.A. testified about the incidents, the jury watched S.A.'s CAC interview, and Hepner's role in the trial was only to report the incidents and to evict Kent. However, Hepner was an important witness and Trial Counsel's strategy was to impeach her so that the jury would not believe the State's case.[74] Trial Counsel testified that his "overall strategy [was] to put the State to the test of whether they can prove any of the charges beyond a reasonable doubt," while also arguing for lesser-included offenses.[75] Thus, attempting to gain every advantage for his client, Trial Counsel reasonably attempted to show that Hepner was not a truthful person in an attempt to attack the credibility of the

---

[73] Kent fails to recognize the overwhelming evidence presented against him at trial which included the testimony of S.A. recalling the sexual abuse and identifying Kent as the abuser, an injury above S.A.'s hymen consistent with sexual assault, and the presence of male DNA on S.A.'s labia majora. *See* App. to Opening Br. at A324–35, A339, A353–55, A375–76, A492, A495, A499.

[74] App. to Opening Br. at A1178 (Feb. 15, 2024 Hearing Tr. at 23:17–20).

[75] *Id.* at A1160 (Feb. 15, 2024 Hearing Tr. at 5:14–20).

evidence as a whole.[76] Further, at oral argument below, Kent acknowledged that impeaching the credibility of Hepner was a legitimate purpose.[77] Trial Counsel also chose to avoid vigorously cross-examining S.A. in front of the jury. This was a reasonable decision because doing so could have alienated some of the jurors.[78] With seemingly few other strategies to pursue, Trial Counsel undertook an attempt to "poke holes" in the State's case wherever possible, including witness credibility.

Removing the distorting effects of hindsight, impeaching a witness's credibility is a viable strategy in a sensitive case such as this. It was not until Hudgins perjured herself multiple times on the stand that the flaws in this strategy became apparent.[79] However, once Hudgins proved to be a dishonest witness, Trial Counsel abandoned his strategy.

Finally, Kent attacks Trial Counsel for failing to adequately investigate Hudgins' "flaws" before calling her to testify. However, it appears that Trial Counsel conducted a reasonable investigation within the short time period he had before calling Hudgins to the

---

[76] *Id.* at A1178 (Feb. 15, 2024 Hearing Tr. at 23:17–23).

[77] *Kent,* 2024 WL 3595633, at *2; *see also Gallo v. Kernan,* 933 F. Supp. 878, 881 (N.D. Cal. 1996) ("It is well settled that impeachment strategy is a matter of trial tactics."), *aff'd*, 141 F.3d 1175 (9th Cir. 1998), *cert. denied*, 525 U.S. 856 (1998); *see also* App. to Opening Br. at A1161 (Feb. 15, 2024 Hearing Tr. at 6:14–22).

[78] Trial Counsel testified that he deliberately chose not to attack the credibility of the minor victim but instead attacked other witnesses' credibility. *See* App. to Opening Br. at A1187–90 (Feb. 15, 2024 Hearing Tr.).

[79] For example, at the October 5, 2023 oral argument on Kent's postconviction motion, his counsel argued that "as expected, [Hudgins] testified that she did not tell Jessica Hepner that there was an incident between Mr. Kent and [M]," "[b]ut the problems began on cross-examination." *Id*. at A1124 (Argument Tr. at 6:10–14).

21

stand. He directed his investigator to confirm the potential impeachment testimony and considered the implications of "opening the door" by calling Hudgins as a witness.[80]

Before the trial began, the State had emailed Trial Counsel and disclosed that Hepner had told Detective Knorr about the incident with Cathy Hudgins.[81] Trial Counsel investigated the information first by asking the State for the unredacted police report of the interaction and for Hudgin's contact information.[82] The State warned Trial Counsel that "[i]f you intend to bring any of this in at trial, I believe that will open the door to other allegations made against the Defendant."[83] Despite this warning, Trial Counsel communicated the information to his investigator and asked the investigator to interview Hudgins.[84] During the interview, Hudgins again denied telling Hepner that Kent had touched her daughter inappropriately. Trial Counsel subpoenaed Hudgins for trial.[85]

Trial Counsel advised that he followed his standard practice and spoke to Hudgins at the courthouse before she testified so that he could observe her demeanor.[86] Further, Trial Counsel testified at several points during the evidentiary hearing that he was not

---

[80] App. to Opening Br. at A1189–1191 (Feb. 15, 2024 Hearing Tr. at 34–36).

[81] App. to Opening Br. at A1167 (Feb. 15, 2024 Hearing Tr. at 12:13–22).

[82] *Id*. at A1169 (Feb. 15, 2024 Hearing Tr. at 14:12–21).

[83] *Id*. at A1170 (Feb. 15, 2024 Hearing Tr. at 15: 13–16).

[84] *Id*. at A1188–90 (Feb. 15, 2024 Hearing Tr. at 33:19–23, 34:18–23).

[85] *Id*. at A1167, 1171 (Feb. 15, 2024 Hearing Tr. at 12:20–22, 16:21–23).

[86] *Id*. at A1197–98 (Feb. 15, 2024 Hearing Tr. at 42:9–19, 43:4–22); *see also* A989 (Public Defender Log).

aware of Hudgins' shoplifting convictions before the State cross-examined her.[87]  This

testimony appears to contradict the trial transcript provided to this Court which reflects that

the State had printed out a copy of Hudgins' criminal history just before her testimony and

Trial Counsel responded, "[s]he will provide me a copy of that."[88]  Citing to this same

exchange, the Superior Court stated that, "[t]he record reflects Trial Counsel spoke with

Hudgins before she testified, and thereafter, the State advised Trial Counsel of Hudgins's

---

[87] *Id*. at A1180 (Feb. 15, 2024 Hearing Tr. at 25:11–14); *see also id*. at A1177 (Feb. 15, 2024 Hearing Tr. at 22:2–6) (Trial Counsel did not look into Hudgins criminal history).  At the evidentiary hearing, Trial Counsel was asked:

> Q:  So at the time you called Cathy—and you just mentioned her cross-examination by the prosecutor—were you aware of her shoplifting convictions?
>
> A:  No, I was not.
>
> Q:  Were you aware of her drug convictions?
>
> A:  No, I was not.

*Id.* at A1180 (Feb. 15, 2024 Hearing Tr. at 25:11–18).

[88] The following exchange took place:

> [The State]:  Your Honor, I'm sorry, and I know I keep bringing up things of timing, one other thing, I did printout Cathy's criminal history, she does have two shoplifting convictions from 2015 and 2016 that the State intends to use.
>
> The Court:  Well, that's …
>
> [Trial Counsel]:  Fine.
>
> The Court:  You understand that that comes in.
>
> [Trial Counsel]:  She will provide me a copy of that.
>
> The Court:  That's fine.

*Id.* at A506.

23

two shoplifting convictions."[89]   However, the State states in its answering brief in this appeal that, "when trial counsel had called Hudgins to the stand to testify, he did not know about her shoplifting and drug convictions."[90]   In his reply brief, Kent states that, "Trial Counsel did not look into Hudgins' criminal history."[91]   This discrepancy in the record and briefing before us about whether or not Trial Counsel knew of the shoplifting convictions before Hudgins testified is not explained.   However, Trial Counsel did testify at the evidentiary hearing that had he known about Hudgins' prior convictions in advance, he still would have simply asked her about her convictions.[92]

As we stated in *Cooke*, "[p]roving that counsel's performance was objectively unreasonable 'has nothing to do with what the best lawyers would have done or even what most good lawyers would have done.'"[93]   "'[A] lawyer's performance is only constitutionally deficient if no competent attorney would have chosen the challenged course of action.'"[94]   "Where 'an attorney makes a strategic choice after thorough investigation of law and facts relevant to plausible options,' the presumption that an attorney acted reasonably is 'virtually unchallengeable.'"[95]   Kent cannot succeed merely by showing that his Trial Counsel could have conducted his defense more effectively.

---

[89] *State v. Kent*, 2024 WL 3595633, at *3.

[90] Answering Br. at 10.

[91] Reply Br. at 4 (citing to A1177 (Feb. 15, 2024 Hearing Tr. at 22)).

[92] App. to Opening Br. at A1207 (Feb. 15, 2024 Hearing Tr. at 52:3–5).

[93] *Cooke,* 2025 WL 16395, at *24 (quoting *Green*, 238 A.3d at 178).

[94] *Id.* (quoting *Green*, 238 A.3d at 178).

[95] *Id.* (quoting *Purnell v. State*, 106 A.3d 337, 342 (Del. 2014)).

Rather, to rebut *Strickland's* presumption of reasonableness, Kent must show that his Trial Counsel's performance was so deficient that he was no longer functioning as the "counsel" guaranteed by the Sixth Amendment.[96]

Here, Trial Counsel did conduct an investigation, at least as to Hudgins' statements to Hepner. Although Trial Counsel's performance could have been more thorough, Kent's argument does not satisfy the high bar required by the first prong of the *Strickland* test for ineffective assistance of counsel. Because we agree with the Superior Court that Kent failed to overcome the strong presumption that his Trial Counsel acted reasonably, we need not address *Strickland*'s second prong.[97]

---

[96] *Id.* (citing *Strickland*, 466 U.S. at 687).

[97] *See Strickland*, 466 U.S. at 687. Kent relies on *Gomez v. State*, 25 A.3d 786 (Del. 2011), but that case is distinguishable. In *Gomez*, a child rape case, the victim's mother testified as to why the defendant and her sister divorced, explaining, "[s]o she told him that she was leaving him because he had committed a crime, and with not just my daughter, but also my niece." *Id*. at 790. The Superior Court denied the defense's motion for a mistrial. This Court ultimately reversed, holding that "[w]hen the jury heard that Gomez had committed a similar sexual offense against Gomez's other niece … which was not the subject of the current proceeding, that testimony created an impermissible inference that he had committed the offense for which he was being tried." *Id*. at 794. The witness in *Gomez* had volunteered the problematic testimony on her own accord. It did not appear to be the result of a defense strategy. In this case, even though Kent's Trial Counsel elicited the testimony about a potential second victim, Trial Counsel went to considerable lengths to attempt to limit that testimony by impeaching the witness on the stand. For example, as noted above, Trial Counsel argued at sidebar for the exclusion of any evidence of the alleged abuse that happened to C or M. *See* App. to Opening Br. at A202, A205, A226. The Superior Court ultimately ruled in favor of Kent, holding that any other allegations of possible sexual abuse were irrelevant and inappropriate. *Id*. at A504, A520. Trial Counsel also objected to certain questioning of Detective Knorr, and in response, the Superior Court limited the questioning to Hudgins' credibility and not to other possible child victims. Based upon the record before us, our decision in *Gomez* does not persuade us that Kent's claim of ineffective assistance of counsel is meritorious.

25

## B. Kent's Second Claim of Error Regarding Count VI Fails Strickland's Second Prong

Kent next argues that his Trial Counsel was ineffective for failing to move for judgment of acquittal on the Continuous Sexual Abuse of a Child charge. In support of this claim, Kent argues that the State failed to show he had recurring access to the victim over the required time frame and that he had recurring access to the victim when he was staying at the victim's aunt's house in July. More specifically, Kent argues that testimony established that he lived at the victim's residence early August 2017. Before that, he lived at the S.A.'s aunt's house. Kent contends that no evidence was presented that he had recurring access to the victim in July 2017 when he lived with the victim's aunt.[98] However, a review of the record convinces us that a motion for judgment of acquittal would have been unsuccessful.

As noted above, the prejudice prong of the *Strickland* test is also an "'arduous standard" in a movant's path because "a defendant 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[99] A reasonable probability is one that "[a]lthough less than a preponderance of the evidence, [is] a probability sufficient to undermine confidence in the outcome," which "requires a 'substantial,' not just 'conceivable,' likelihood of a different

---

[98] *See* Reply Br. at 9 (arguing that Kent lived at S.A.'s house from early August to October 10, 2017, and "[s]ince that is less than a three-month period, the State was required to prove Mr. Kent's recurring access from at least July 1, 2017 to early August 2017," and that "[t]he State did not elicit any such testimony from the adults.").

[99] *Cooke,* 2025 WL 16395, at *25 (quoting *Starling*, 130 A.3d at 325 (in turn quoting *Strickland,* 466 U.S. at 694)).

result.'"[100]  We agree with the Superior Court that Kent's claim fails to meet the second prong of *Strickland* because he did not demonstrate that had Trial Counsel filed the motion, it is reasonably probable that it would have been granted.

In reviewing the denial of a motion for judgment of acquittal, we examine "whether any rational trier of fact, viewing the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt of all the elements of the crime."[101]  Throughout the trial, the State offered testimony showing that Kent sexually abused the victim "a lot" and that the abuse occurred both at her house and at her aunt's residence.[102]  Kent argues that there was insufficient evidence that he had recurring access to S.A. at her aunt's house in early July.  He maintains that the State did not elicit any such testimony from adults.[103]  But Hepner testified that S.A. had stayed at her aunt's while Kent was also there, and S.A. testified that Kent assaulted her "a lot" at her house and once at her aunt's residence.[104]

Under Delaware law, Continuous Sexual Abuse of a Child requires that a person, either residing in the same home with the minor child or having recurring access to the

---

[100] *Id*. (quoting *Cullen,* 563 U.S. at 189).

[101] *Hopkins v. State,* 293 A.3d 145, 150 (Del. 2023).

[102] App. to Opening Br. at A255 (S.A. Trial Test. at 16:3–4), A263 (S.A. Trial Test. at 24:13–17).

[103] Reply Br. at 9.

[104] App. to Opening Br. at A246 (Hepner Trial Test. at 7:7–15), A1016 (CAC Interview).  At the October 5, 2023 oral argument, referring to the aunt's house, Kent's counsel stated that, "[i]t is undisputed in the record there was one time where S.A. stayed over there and that's when three charged offenses occurred in one incident." A1136 (Argument Tr. at 18:15–18).  The State argued that because Hepner testified that S.A. slept at the aunt's house, and that Kent was a close family friend who moved in and lived at the aunt's house for a period of time, the jury could infer that Kent had recurring access at both places.

child, intentionally engages in three or more acts of sexual conduct with a child under the age of eighteen over a period of time not less than three months in duration.[105] "It is now well established that a victim's testimony alone, concerning alleged sexual contact, is sufficient to support a guilty verdict if it establishes every element of the offense charged."[106]

S.A. established through testimony specific facts regarding the nature of the sexual abuse.[107] She was able to differentiate between multiple instances of abuse, describing the frequency of abuse that occurred at her home ("a lot") and the single time it occurred at her Aunt Carolyn's home.[108] In both her in-person testimony and her recorded CAC interview, S.A. was able to give a precise recollection of the acts that occurred, testified as to the number of acts that occurred, and provided a general time frame. The jury was able to observe the child's demeanor as it listened to the detailed accounts of the abuse.[109]

---

[105] 11 *Del. C.* § 776(a).

[106] *Farmer v. State,* 844 A.2d 297, 300 (Del. 2004) (citing *Hardin v. State,* 840 A.2d 1217, 1224 (Del. 2003)). Further, this Court has held that testimony about the nature of sexual acts, without a precise date, time, or place, may sufficiently support charges of child sexual abuse if the testimony describes the kind and number of acts with sufficient specificity and provides a general time frame in which the acts were committed. *See Bartholomew v. State*, 929 A.2d 783, 2007 WL 1476456, at *2 (Del. May 22, 2007) (TABLE); *Taylor v. State*, 982 A.2d 279, 285 (Del. 2008).

[107] App. to Opening Br. at A264 (S.A. Trial Test. at 25:1–18).

[108] *Id.* at A255, (S.A. Trial Test. at 16:3–4), A1016 (CAC Interview).

[109] During the trial, S.A. testified briefly. During her testimony, the interview with the forensic interviewer (which was recorded) was played pursuant to 11 *Del. C.* § 3507. After the video recording was played, S.A. was recalled to the witness stand and testified that everything said in the interview about Kent was the truth. App. to Opening Br. at A273 (S.A. Trial Test at 34:19–22).

Further, the State established that Kent lived with Hepner and her family while they were living with Hepner's mother from January 2017 to April 2017;[110] that Kent lived with Aunt Carolyn from May 2017 through some point in July 2017;[111] that in late July or early August 2017, S.A. and her family moved into their new home, and Kent moved in shortly thereafter;[112] and that during the time between July 1, 2017, and October 11, 2017—the date range in the indictment—Kent was either living at Aunt Carolyn's house or with S.A. and her family.

Viewing the evidence in a light most favorable to the State, a rational juror could have determined that the abuse occurred at the home of S.A.'s aunt in early July. Although the exact date of the abuse at the aunt's residence was not specified by direct evidence, whether the evidence circumstantially established that the abuse occurred over a period of not less than three months could properly have been viewed by the trial judge as presenting a question of fact for the jury. [113] Because Kent cannot demonstrate that had Trial Counsel moved for judgment of acquittal, it is reasonably probable the trial judge would have granted such a motion, he cannot establish prejudice to satisfy the second prong of *Strickland*.

---

[110] *Id*. at A175, A177 (Hepner Trial Test. at 19:10–21, 21:4–23).

[111] *Id.* at A176–77 (Hepner Trial Test. at 20:14–23).

[112] *Id.* at A173 (Hepner Trial Test. at 17:15–19).

[113] *See Poon v. State,* 880 A.2d 236, 238 (Del. 2005).

## IV.    CONCLUSION

For the reasons set forth above, the Superior Court's judgment denying the motion for postconviction relief is AFFIRMED.